IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

APRIL B. HARRIS,

Plaintiff,

vs.

OUTDOOR VENTURE CORPORATION
and JAMES C. EGNEW,

Defendants.

6:11-CV-300
London, Kentucky
November 1, 2012
2:00 p.m.

TELEPHONIC CONFERENCE

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HANLY A. INGRAM,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
S. DEREK BAUER, ESQ.
DARRELL J. SOLOMON, ESQ.
McKenna Long & Aldridge, LLP-GA
303 Peachtree
P.O. Box 5300
Atlanta, GA 30308

FOR THE DEFENDANTS:
ASHLEY K. BROWN, ESQ.
Ward, Hocker & Thornton - Lexington
333 West Vine Street, Suite 1100
Lexington, KY 40507

JASON M. OBERMEYER, ESQ.
D. DUANE COOK, ESQ.
Duane Cook & Associates, PLC
135 North Broadway
Georgetown, KY 40324

CONTINUED:

HEATHER M. MCCOLLUM, ESQ.
Quintaros, Prieto, Wood & Boyer, P.A.
2452 Sir Barton Way, Suite 300
Lexington, KY 40509

COURT REPORTER:

Rhonda S. Sansom, RPR, CRR
Federal Official Court Reporter
United States District Courthouse
101 Barr Street, Room 413
Lexington, KY 40507
(859) 619-3624

Proceedings recorded by mechanical stenography, transcript produced with computer.

(At 2:00 p.m. on November 1, 2012, with counsel for the parties present telephonically, the following proceedings were had.)

THE HONORABLE HANLY A. INGRAM: We are on the record, so I will ask the Clerk to call the pending action, please.

THE CLERK: Yes, your Honor. London Civil Action 11-CV-300, April B. Harris versus James C. Egnew and Outdoor Venture Corporation.

THE COURT: All right. Thank you.

Madam Court Reporter, can you hear me okay, ma'am?

THE REPORTER: Yes, your Honor.

THE COURT: Thank you, ma'am.

All right. Counsel, state your appearances, please. When you state your appearance, please identify yourself and your client or clients and also let me know whether anyone else is listening on your end via speaker phone or teleconference or anything like that.

So counsel for the plaintiff, would you state your appearance, please.

MR. BAUER: Derek Bauer for plaintiff April Harris. With me in my office on speaker phone is my colleague, Darrell Solomon.

THE COURT: All right. Mr. Bauer and Mr. Solomon, good afternoon to both of you all.

Counsel, let’s -- well, counsel for the defendants,

would you state your appearances, please.

MR. COOK: Your Honor, Duane Cook for the defendants. With me in my office here is Jason Obermeyer. No one else is in the room with us.

THE COURT: Okay. Any other counsel on the line?

MS. BROWN: Yes, Judge. This is Ashley Brown on behalf of Outdoor Venture Corporation and James Egnew, and no one else in my office is listening in.

MS. MCCOLLUM: And Heather McCollum on behalf of James Egnew individually and only Mr. Egnew, and no one else is listening in my office.

THE COURT: Okay. Thank you, as well.

All right, counsel, a couple of sort of general matters with respect to this call. When you speak, please identify yourself before you begin to make any substantive statements so that the court reporter and that I can keep track of who is doing the talking.

Also, our time is a little limited this afternoon. I have -- I have a couple of felony proceedings this afternoon. I have basically for this call I have a hard stop right about 2:30, so we need to sort of bottom-line the issue this afternoon.

I reviewed the parties' submissions. They are both dense and wide-ranging. That's because I think at this point what we're talking about is the sufficiency of responses or

objections to some 29 different discovery requests. Those are discovery requests served by the plaintiff. So we're talking about an awful lot.

And I have in front of me plaintiff's submissions. It's an inch thick. I've read just about everything. I have had some time to look at the discovery requests; but quite frankly, there're so many that the possibility of actually accomplishing anything in this call may be limited.

And here is why I say that. There are two purposes to a call like this. The first is to potentially narrow the dispute, if that can be done. The second is for the Court to issue a provisional ruling to guide counsels' consideration of whether further briefing is necessary.

I'm not encouraged by what I've seen in the correspondence and the ex-parte -- well, not ex-parte, the submissions sent in via e-mail. I'm not encouraged that the dispute can be narrowed. There just does not seem to me to be much possibility for give and take, but if I'm mistaken in that impression I want counsel to let me know as we get into these discussions.

Another note on the correspondence. You know, the last time we had a call in this case I think I made some comments that the tone of the briefs had improved, and it had. Unfortunately, when I look back at the correspondence, what I see is -- well, what appears to be letters written without much

forethought as to whether they would ever actually be presented to the Court.

And I just want counsel to know that I read those letters and Judge Thapar reads those letters, and they very often become a part of the record. And there are some tones, some sarcasm, even, in these letters that as I've said before in this case just does not advance the Court's consideration of the issues presented.

With that said, let me start with you, Mr. Bauer. I have to be somewhat skeptical of your client's position because of a couple of reasons. First, the timing. These discovery responses that you and your client are questioning were served in July, but there does not seem to be any -- at least, based on what I've seen, there does not seem to be any pursuit of those responses as insufficient until the briefing on the motion for the previous motion to compel began.

And then the first letter that I have is a September 10th letter from you, Mr. Bauer, that says "In the event the Court rules that defendants are entitled to discover financial information of nonparty Camel, we will insist that defendants withdraw their relevancy objection to the request that we're here to discuss today."

So, as I say, that letter was on September 10th, quite some time after the responses were served.

I raise that because I wonder, if this is discovery that

is important and its relevancy stands on its own, why it wasn't pursued in a more prompt fashion. But then additionally, I just have to comment that the Court's order on the previous motion to compel was focused in terms of relevancy on the plaintiff's description of her claim for emotional distress.

There was a lot in the briefing back then of the merits. The parties were trying to convince the Court on a discovery dispute that they were correct on the merits, for various reasons, but the focus of our order was on Ms. Harris's claim for emotional distress.

What I see now from the plaintiff is a set of sort of predictions about ways in which that information that I required to be produced could be used to support some other sort of defense. So I have to be somewhat skeptical of the way that these issues proceeded, Mr. Bauer.

But let me ask you, what is it that you meant in that letter of September 10th? Why is it that your client's pursuit of this information was not a function of its independent value in the case but instead was a function of whether the Court ordered the production of Camel's information?

MR. BAUER: Thank you, your Honor. This is Derek Bauer. Those are very fair questions. As I think the Court will recall from the briefing and argument that was involved in defendants' motion to compel a lot of financial information from nonparty Camel Manufacturing that the plaintiff from the outset in this

case was trying to craft a complaint on behalf of herself and her own individual injuries, separate and apart from any injury to her company that may have been caused by the same conduct that's the subject matter of her individual claims in this lawsuit.

And the plaintiff tried -- and that's been a difficult task for us, because of the nature of her damages. And we respect and appreciate that, but this case isn't about Ms. Harris's company so much as it is about her personal information and, as you know, her contention that the defendants, by virtue of their long experience with government contracting, their participation in MSR -- minimum sustaining rate -- and War Stopper protocol, they know what they did here. The information they submitted in the bid protest had really nothing to do with the merits of the award of the bid protest.

That's really the core of Ms. Harris's case. Now, we tried to keep it and we were hoping to keep it focused on that and to avoid the ability and intent of the defendants to use this case as a weapon or a mechanism to gain access to Camel information that we always felt was really kind of far afield from the real core issues in this case.

But when defendants made it very clear in their initial discovery request right out of the gate that that wasn't how they were going to limit their approach to defense of this case, which obviously they had the right to craft the scope of their

defense however they wanted to, we did ask for this information from defendants right out of the gate, as well, in anticipation that if we couldn't come to agreement with the defendants about what the real scope of this case ought to be then we needed to be prepared to defend ourselves against the very kind of assertions that defendants made plain they intend to make in the briefing they put before your Honor in support of the motion to compel and in their correspondence back and forth with us.

And specifically, you know, their arguments that effectively Ms. Harris's lifestyle and how it’s funded by her company is, and I quote, "Relevant" -- and this is from their brief to you back on September 14th. Quote: "Relevant to the issue of whether Camel properly fits within the exception to permit a competitive bidding carved out by the, end quote, MSR protocol."

And they've also, of course, argued that they have to be able to show to the jury that any injury to Ms. Harris was because she was overpaying herself.

And they've made it quite plain in their position since, and you've seen the correspondence. And there were discussions before that correspondence among counsel where, you know, we indicated, as you've seen also in our objections to their initial discovery responses, it was our hope to keep that kind of information from both sides out of this issue -- this case, to keep this case narrowly focused so that we wouldn't get into

the kind of situation that we're in now, where we do have, as you put, wide-ranging and dense discovery efforts into these companies' financials and these individual defendants' and plaintiff's financials that we think are kind of astray from what the core issues in this case ought to be about.

But all of that said, what we told the defendants before this dispute started was if we're going to make these arguments, if you are going to argue, then you have to show the jury that despite the fact that they told the government, your Honor, that OVC should have gotten the same award that Camel got here because OVC had less work than Camel; if despite that claim they are going to show the jury that Camel was only in financial distress because Ms. Harris paid herself too much, then we're going to be in a position where we have to show the jury something else other than just what Ms. Harris was paid so that they can put this into context, as well as understanding exactly what the mental state was of defendants when they made that claim to the GAO in their bid protest and what their own finances were.

And what their own finances illustrate is a fair and reasonable salary for a CEO of a company that they claim is doing even less business than Camel so that the jury has a comparison.

But otherwise, plaintiff is going to be -- plaintiff will be prejudiced, your Honor, and the jury will have no way to

measure the integrity of those arguments.

THE COURT: Let me turn back to the letter of September 10th. And there was never any objection made to my order that the Camel and Harris information had to be produced based on the relevancy findings that I made; is that correct, Mr. Bauer?

MR. BAUER: We did not appeal it, your Honor, that's correct.

THE COURT: Well, I mean, the letter -- these words matter to the Court. The letter of September 10th says: "For these reasons, in the event the Court rules that defendants are entitled to discover financial information of nonparty Camel, we will insist the defendants withdraw their relevancy objections."

Well, the relevancy objections aren't a function, in my mind, of what else the Court may order to be produced.

And one important omission in that letter is a reference to Mr. Egnew. I mean, I don't -- I guess what I'm asking -- to Ms. Harris. it doesn’t say in the event the Court rules the defendants are entitled to discover financial information of nonparty Camel and financial information of Harris.

So why is it that there's any link whatsoever to the personal financial information of Mr. Egnew?

MR. BAUER: Well, your Honor, that's a fair question. And the link is because they have alleged that Ms. Harris is salaried, and payments to herself of varying forms from Camel are indicative of Camel's eligibility for a sole-source award

under the MSR program. That's the position they've taken multiple times in this litigation.

In fact, your Honor, their opening summary to you of -- and that's the brief that I was just quoting, Page 8 from their brief to you on September 14th.

Some of Ms. Harris's financial information was always going to be relevant and producible; and, you know, we've never contested that. We've never suggested that her tax returns and her personal income wasn't relevant, to the extent she’s making a claim for her own personal damages in this case.

But the problem here is that defendants have kept well -- at this point well articulated that their theory of the case is "We have a legitimate basis to submit personal information about this woman to the government," despite their admissions that they've never had such information about themselves be relevant to any MSR or eligibility for any award. They can't point to any other government contractor who has ever had this type of information relevant to any award. They can't point to any statute or regulation that makes such information relevant. And they can't point to any other instance, or any instance ever, in which any government agency has ever considered this type of information.

THE COURT: But if you had -- if you had those admissions, why is the next step necessary? I mean, the admission is no, that information has never been submitted

before. Why do you need the information?

MR. BAUER: There's two reasons. First, because they have argued that they are going to show the jury Camel's financial informations -- financial information and Ms. Harris's salary-type information for the sole and -- well, not sole, but one express purpose of arguing to the jury that Camel should not have been eligible for that MSR award because Ms. Harris was taking too much money out of the company.

And they are going to give this jury a specific dollar figure and say -- I don’t know what her salary was, but let’s just say for argument's sake that it was $100,000. And they are going to say that "That was too much, and that's why we had to tell GAO that this company should not have been eligible for this MSR award and our company should have been considered for it."

And if that's the argument that they've already indicated they are going to make, if that's the argument they are going to be permitted to make and they now have the discovery to provide the actual data to the jury with respect to, then Ms. Harris, I believe to be fair, has to be able to show the jury that when they made this argument, when they tell the jury that was the reason for submitting this private information about this woman's daughter's wedding, about her community activities, pictures of her home; when they did that, they knew at that time that their company was far more

productive, far more healthy financially than Camel, and they knew that Mr. Egnew's salary was far in excess of what Ms. Harris actually paid herself.

And the jury needs to understand what OVC knew about its financial situation when it was telling the government, "We were eligible for this and they were not, and that's why we submitted this deeply personal and private information about this woman to the government."

And this is why we didn't think any of this information should have been relevant to the case from the beginning. We hoped that it wouldn't be. That's why, in my September 10th letter, what I told the defendant was, "If you take the positions that make this relevant, if you claim that it's relevant to support the positions that you're taking, you are going to give us no choice but to ask for this information so that we can rebut the position you are taking.

Because, your Honor, we believe this information is firmly going to disprove the suggestion that Mr. Egnew or his company ever believed that their company was better positioned or appropriately positioned to receive this award, rather than Camel. And that's the position they've argued that they're going to take.

THE COURT: Okay, Mr. Bauer. I understand. I follow.

I mean, I'm still left with I guess what was the false hope of being able to limit the amount of discovery in the way

that you've described it, because what matters in my view and was made plain in my order is not what you expected the defense to be but how your client articulated her claim for emotional distress. And that -- that is lost in the distinction between what is relevant to that claim and what you are hopeful may be relevant to defenses you're predicting may be presented. That distinction is completely lost on what has been submitted on this discovery dispute.

Let me turn, though, to the defendant for a moment. Mr. Cook, are you going to be primarily addressing the matter from your client's perspective, sir?

MR. COOK: Yes, your Honor.

THE COURT: Okay. As made plain in my order of September 27th, the scope of discovery is broad. It encompasses any matter that bears on or that reasonably could lead to other matters that could bear on any issue that is or may be in the case. If there's any possibility that the information sought may be relevant to the claim or defense of any party, it’s discoverable.

Why is the information sought at this point not discoverable under that standard?

MR. COOK: Your Honor, I suppose -- this is Duane Cook. I suppose I should advise the Court as a -- as an opening statement that while it looks like it was perhaps ill-considered at the time, we have long ago agreed to produce tax returns. So

Mr. Egnew's tax returns should not be an issue in this case.

Moreover, Mr. Bauer mischaracterizes our arguments both to the GAO and the arguments that we'll make in this Court.

Ms. -- excuse me, Camel and Ms. Harris argued to the GAO that Ms. -- that Camel needed the GAO contract because it would go out of business if it didn't get the contract. OVC has never made that argument.

So to say that Ms. Harris needs OVC's financial information to show that they weren't about to go out of business and consequently had no more claim to the -- this contract than Camel is to set up a straw man. I mean, we'll stipulate that we weren't just about to go out of business.

What Ms. -- what Ms. Harris has said -- and there's been some dispute back and forth about this. But after the production that she has made and the production of this letter that's attached as Exhibit B to our most recent filing with your Honor, which is a letter from Ms. Harris to the Defense Logistics Agency in which she says quite explicitly, "We're going out of business if you don't -- if we don't get this contract."

We never made that statement, your Honor; and consequently, anything about our finances can't be relevant to make a claim that we were entitled to the contract for the same reason that Camel was entitled to the contract.

In fact, what we said, the quote that Mr. Bauer said

about the -- he said we told the government that we needed the contract just as much as Camel did, that was a quote not from anything that we submitted but a quote from the GAO decision.

The protest that we submitted is attached as Exhibit D to -- to our most recent filing with your Honor, where we asked in Paragraph D --

THE COURT: Let me back up --

MR. COOK: In fact, our protest to the government says: "Outdoor Venture requests that the protest be sustained and that indeed they be directed to solicit OVC and other potential offerors for this award."

THE COURT: Let me stop you there, Mr. Cook. Where did the GAO get that information? I mean, if that's not OVC's statement, what was the basis for the GAO including it in whatever you're referring to?

MR. COOK: I have no idea, your Honor. I mean, I think we -- we did say at some point to them, "Look, Camel has more business than we do," but we never said to them, "We're going out of business if -- if we don't get this contract."

And we said ultimately, because this protest ought to be sustained, this ought to be opened up to competitive bidding. Not that we should get -- that we should get the contract and Camel should not, but that it should be opened up to competitive bidding.

I think we knew at that time, frankly, that our bid was

the lowest bid. But our argument was that Camel did not deserve this contract under the statute that provides for noncompetitive bidding -- which, by the way, says nothing about -- about minimum sustaining rate.

So, you know, to say that our financial information is relevant to show that we -- that our -- that we were no more deserving of this contract on a noncompetitive basis than was Camel, that's a straw man. We never made that argument.

THE COURT: Well, is one of the questions to be tried whether, at the time the protest was submitted, the defendants had a reasonable basis to believe that what Ms. Harris characterizes as her private information, that's -- that's to be determined later, obviously. Whether that private information is relevant to the bid protest, is that one of the questions to be tried, Mr. Cook?

MR. COOK: That's one of the questions that at least plaintiff says is to be tried. But that question is a -- is a -- that's a legal question, your Honor, and it's an objective test. It doesn't -- it doesn't depend on information about -- about -- about OVC.

But the legal issue is whether -- you know, whether only the information about -- about the minimum sustaining rate was relevant to the decision about whether Camel should get this no-bid contract.

And your Honor, with our filings here, we showed you I

think the references to minimum sustaining rate across all federal law. There's one statute, clearly not applicable in this situation. There's one regulation -- excuse me, there's no regulations that mention the term "minimum sustaining rate."

There's one unreported District Court case which held specifically that the minimum sustaining rate was not -- the determination of minimum sustaining rate in this case was not sufficient to support a no-bid contract.

There are 15 administrative decisions back and forth, one of which involved another bid protest that OVC filed against another company that got a no-bid contract and one protest against another Camel no-bid contract that was awarded in 2009.

The legal standard for determination of whether a no-bid contract should be awarded is found in the statute that we cited your Honor to which requires a finding that: "If necessary to award the contract to a particular source or sources in order to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services."

And we -- and our position in that is that, regardless of what information was submitted by Camel or OVC on the minimum sustaining rate, that that's not the be-all and end-all of the determination.

The determination is whether that the -- that the government should have made is whether Camel would go out of business if the contract was not awarded, and in that sense

distributions to its sole shareholder were relevant.

So that's -- you know, that's our -- the argument is that we -- we knew that the distributions to the shareholder could not possibly be relevant. We don't even get to that decision until we decide -- until the Court decides that -- that only the minimum sustaining rate information was -- was to be considered by the government. And the statute clearly doesn’t say that.

THE COURT: Mr. Cook, are you contesting Mr. Bauer's description of your anticipated defense at the trial?

MR. COOK: I am, your Honor.

THE COURT: Tell me how.

MR. COOK: He has -- he has said their argument will be or has been -- and it’s a little difficult for me to follow what he's saying -- is that we deserve this contract because we were in just as bad a shape as -- as Camel.

We never made that argument. We’ll stipulate that we weren't. Our -- our claim to the GAO was that Camel wasn't in bad-enough shape to have been deserving of a no-bid contract under the -- under the statute which allows deviation from competitive bidding in that narrow circumstance.

We're not going to make that argument. We're going to make the argument in the -- in the abuse of process claim. We're going to make a lot of arguments in the abuse of process claim.

But we're going to make the argument that the information we submitted, while perhaps not dispositive, was relevant to the issue of Camel -- whether Camel was about to go out of business when it got the no-bid contract on the theory that, you know, if I have a company that has $2 million in cash today and I take it all out today, and tomorrow I say "I should get a no-bid contract because I'm broke," you know, the money that I took out of the company today is relevant to the question of whether I should get a no-bid contract because I argue tomorrow that.

And Mr. Egnew or OVC's financial condition is irrelevant to that determination whatsoever.

THE COURT: Ms. McCollum, do you have anything to add to the discussion we've already had so far, ma'am?

MS. MCCOLLUM: No, sir.

THE COURT: Any other counsel for defendants want to chime in to the discussion I've had with Mr. Cook?

MS. BROWN: No, your Honor.

THE COURT: Okay. Mr. Bauer -- who was that that just spoke?

MS. BROWN: I'm sorry, that's Ashley Brown.

THE COURT: Thank you, ma'am.

Mr. Bauer, let me turn back to you. Is there any narrowing of the dispute, from your perspective, based on the conversation we've all had this afternoon?

MR. BAUER: No, I don't think so, your Honor.

And if I might just make two real quick points. I know we're at your hard stop. I'll be very quick.

THE COURT: Go ahead.

MR. BAUER: All right. Mr. Cook has just explained that it is their -- first of all, I think he's mischaracterized our position. But he's explained that it is their defense that -- and what he intends to argue on the abuse of process claim is that the personal information about Ms. Harris and her family was, to use his words, relevant to whether Camel was going out of business because it shows exactly how much she was taking out of this company.

And our point, number one, is that if this litigation is going to be about arguing to the jury about what relationship the personal finances -- personal finances of the owner of this company has to its eligibility for sole-source awards and the legitimacy of that information to the government's consideration of such awards, then the jury must be permitted to hear both sides of that equation.

If the defendants are permitted to say that Ms. Harris was paid too much to justify the award that OVC should have gotten -- and make no mistake, that is what their bid protest argued for -- then Ms. Harris should be permitted to show the jury just how much Mr. Egnew thought was fair to be paid by OVC without sacrificing OVC's eligibility for that same award.

So they have made this information essential to Ms. Harris's ability to rebut that argument that they just acknowledged to you that they are going to make.

And here is the second point. They have -- if they are permitted to argue that Camel wasn't eligible for a sole-source award because of its true financial condition, then Ms. Harris needs to be able to show the jury that what OVC knew of their own receipt of past minimal sustaining rate, noncompetitive awards, that Mr. Egnew's salary and OVC's balance sheet had nothing to do with OVC's eligibility for those awards, just as Ms. Harris's salary and Camel's balance sheet were irrelevant to the award in this particular situation.

Their representations through their counsel as to what OVC's history was with the minimal sustained rate program is insufficient. Even their admissions about those things are insufficient for that purpose.

And I'll give you an example. Their counsel, defense counsel, has repeatedly told us and the Court that this is a dead-end argument because OVC has never received minimum sustaining rate-funded awards, or words to that effect.

So for that very reason we asked the DOA Troop Support two weeks ago on a FOIA request to give us all of the awards to OVC that included War Stopper fund awards based on OVC's minimal sustaining rates; that is, all their awards to OVC that were not based on open competition and were based on DLA's support

determination that OVC needed product orders to maintain its productivity rate, its minimum sustaining rate.

And that's what we submitted to the Court in Exhibit H, was the DOA Troop Support response. And only six of those apparently were actually War Stopper-funded awards. Not all of the information DLA Troop Support gave us included minimum sustaining rate, both noncompetitive awards. But more than $16.9 million, all since 2007, were confirmed by DLA Troop Support to be War Stopper minimum sustaining rate awards to OVC.

And so there is a disconnect between what DLA Troop Support is telling us they have received over the years by virtue of participating in the minimum sustaining rate protocol and what their counsel is telling us.

And if we're going to be able to stand in front of the jury and say, "They knew well what criteria are necessary to be eligible for these awards, because they have gotten them themselves."

So we have to have that discovery. And the counsels' representation to us that nothing exists is not going to be sufficient, because we are getting contradictory information from the DLA Troop Support.

So we feel it’s essential that they provide us in discovery with the information to verify exactly what OVC's participation is in this MSR program and what awards and funding they've received under the same program exists.

Then, when we get to the point in front of the jury where we are arguing what they knew and what was reasonable for them to believe, we have all that information and the jury has all that information. Because we haven't received, candidly, I think, a full report from defense counsel about what actually exists.

THE COURT: Okay. Well --

MR. BAUER: Your Honor, if I may, just briefly.

THE COURT: I think I need to cut this off.

MR. BAUER: Okay.

THE COURT: I scheduled this earlier and rescheduled it. Based on what's been presented and what I've heard today, I have a better chance of getting every candidate in the country that's on the ballot to agree to something than I do to narrow the dispute.

All right. Here is where we are. Mr. Bauer, I have to be honest, I’m skeptical. I'm skeptical of the way in which this discovery was pursued after the responses were made several months ago.

It seems to me that linking them to the issues raised with respect to the production of your client's and Camel's information at a time when very little time left -- was left for discovery has to cause me to question the legitimacy and whether this was more of a sort of a tit for tat or some effort at retaliation to obtain information that -- not by you, by your

client -- some effort at retaliation to maybe hopefully gain some information to be used in trial to simply make your client's adversary look bad instead of really help the trier of fact.

But that's my skepticism, based on what's been presented so far. I don't know that I've ever seen the linking of information requested in discovery months prior to another motion to compel being filed and linking those in such a way that it's contingent upon the discovery of what was subject to the motion. I don't think I've ever seen that before.

So it's highly unusual, and it causes me to question whether and what the original purpose for seeking the discovery was. I understand conditions and positions change as the litigation is pursued, but discovery stands on its own.

And what the position now that Ms. Harris has taken is, "Well, here's what the defenses are, and we have to have this information because of those defenses."

Well, I see in the submissions that I guess the plaintiff's claim is those defenses weren't really made clear when the motion to compel was filed. I don't know whether that's true or not. I have to question it.

But I'm skeptical, is the bottom line. I recognize the broad definition of what is relevant and permissible in discovery, but I -- I wouldn't be fair to you, Mr. Bauer, or to your client in his decision-making process going forward if I

didn't make it known that I was skeptical about the way it’s been presented and what's being pursued now.

In any event, the matters are far too complicated and dense to issue a comprehensive provisional order on this call. But we have now -- after discovery has been extended, there is time, of course. But we need to move on with it.

Mr. Bauer, if you are going to file a motion to compel after discussing this call with your client, how long do you need to do that, sir?

MR. BAUER: We can do it within a week, your Honor. By next Friday, if that schedule commends itself to you.

THE COURT: Sure. Let me -- let me see. All right. If the motion to compel is filed on or before November 9th, Mr. Cook, how long would you all need to respond, sir?

MR. COOK: Your Honor, we'd need a week.

THE COURT: All right. So then responses -- excuse me, response from the defendant is due on or before November 16th.

Mr. Bauer, we're bumping right up against Thanksgiving obviously in the next week. What are you thinking in terms of reply time, sir?

MR. BAUER: We would prefer a week, but if we can submit it by that Wednesday before Thanksgiving we should be okay.

THE COURT: Well, I mean, a week is fine with me, but that's the Friday after Thanksgiving. If you want until Monday, the 26th, Mr. Bauer?

MR. BAUER: Yes, please.

THE COURT: Then I will set the briefing schedule when the motion is filed, as I just described. The motion to compel due on or about the 9th, the response on or before the 16th, the reply on or before the 26th. The normal page limitations in the local rules will apply.

And if someone thinks a transcript of the representations made today is necessary so as to guide my consideration of the issues, go ahead and promptly order one and include it in your filing.

Any other matters we need to take up at this time, Mr. Bauer?

MR. BAUER: No, your Honor.

THE COURT: Mr. Cook, anything else we need to take up at this time, sir?

MR. BAUER: No, your Honor. Thank you.

THE COURT: Sure.

Let me just ask out of curiosity. And this is my function of part of my role here on the London docket, is conducting settlement conferences at the joint request of the parties.

You know, we got close to the end of discovery earlier. Were there any significant settlement discussions engaged in? I'm not trying to determine what the positions were or anything like that, I'm just wondering if there were any discussions or

have been up to this point.

Anything along those lines yet, Mr. Bauer?

MR. BAUER: Nothing substantively.

THE COURT: Okay. Is that correct, Mr. Cook?

MR. COOK: Yes, your Honor.

THE COURT: Fair enough.

You'll see a minute entry emanating from this call, and we'll look for a briefing if plaintiff decides to file a motion to compel.

Otherwise, thank you for your participation, and I hope everyone has a nice day.

(Proceedings adjourned at 2:44 p.m.)

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Rhonda S. Sansom 11/5/2012

________________________________ ______________________
Rhonda S. Sansom, RPR, CRR Date

ORIGINAL TRANSCRIPT FILED ELECTRONICALLY